BOARD OF EDUCATION OF OGDEN CITY et al. v.
ANDERSON, State Auditor, et al.

No. 5848.   Decided December 23, 1937.   (74 P. [2d] 681.)

*Wade M. Johnson,* of Ogden, and *J. Robert Robinson,* of Provo, for plaintiffs.

*Joseph Chez,* Atty. Gen., and *S. D. Huffaker* and *Grover A. Giles,* Deputys Atty. Gen., for defendants.

MOFFAT, Justice.

Petition for writ of mandamus. The facts are not involved nor disputed, though not easy to state briefly. As we understand the position of plaintiffs, it is alleged that during the fiscal year July 1, 1935, to June 30, 1936, and during the fiscal year of July 1, 1934, to June 30, 1935, specified sums of money came into the hands of the officers named as defendants, which funds were derived from delinquent tax redemptions of previous years, viz., 1931-32, 1932-33, and 1933-34.

Plaintiffs contend that under the laws of this state the duty is imposed upon the defendants to allocate the funds received from redemptions of taxes, levied for school purposes, to the year of levy and not to the year of collection or receipt thereof.

This court is requested to require the defendants by mandamus to allocate or, in effect, to reallocate redemption funds collected in the years 1935 and 1936 to the years 1931 to 1934, it being claimed that during the 1931-34 period the state tax commission, pursuant to law, directed and levied annually a state tax for district school purposes which was calculated to raise as nearly as may be $25 for each person of school age in the state as shown by the last preceding school census. It is then claimed that because of delinquencies in payment of taxes during the years mentioned (1931-34) the school districts did not receive from the state tax for district school purposes the full $25 per capita and that the state should nevertheless allocate to the school districts the full amount of $25 per capita for the years indicated the proportionate amounts arising from delinquent tax collections, and refer the amounts back to the years of levy to make up for the deficiency in amount falling short of the $25 per capita.

The contention means that each year the state must charge itself the sum of $25 per capita for each person of school age in the state as shown by the last preceding school census and, if there be insufficient collected, and there remains a debit against the state, it must be canceled as and when the delinquent state school taxes are collected. The state must make up from other sources of revenue the amount necessary to cause the $25 fund to be maintained in order to avoid such liability. If this is done, then as the redemption delinquencies are collected and allocated, the state school fund would then in succeeding years exceed the $25 amount contended for.

We think the statute was intended to be operated upon an annual revenue basis. Tax levies made in advance for

the ensuing current year at best must be made upon estimated factors (rates, values, delinquencies, interest, other funds, etc.) and an estimated percentage of collection. The process by which the stated $25 fund is to be secured cannot, in the nature of things, be expected to hit exactly the $25 mark. The funds received based upon the calculations officers must make, may exceed the $25 for each person of school age, therefore the $25 amount specified by the statute and the Constitution must be regarded as the maximum for the given year to be attained as nearly as practicable.

The Constitution provides for a "levy for district school purposes which together with the interest on the permanent school fund and such other funds as may be available for district school purposes, will raise *annually* an amount which equals $25.00 for each person of school age in the state as shown by the last preceding census." Const. Utah, art. 13, § 7. There is neither statutory nor constitutional requirement directing officers charged with the collection, distribution, or allocations of funds from tax delinquencies to allocate or attach them to any fund for any given year or period. "The County treasurers shall pay over to the boards of education, *as fast as collected or realized,* their proportionate amount of delinquent taxes, with interest and costs on all tax sales." (Italics added.) Section 75-12-14, R. S. Utah 1933. This section relates to county school and district school taxes. There is no allocation back to a previous year of such taxes, or any taxes, tax sales, or otherwise. Current and prompt settlement of accounts as between public officers is the settled policy of the law. All taxes levied against property, whether state, state school, county, county school, district school, city, or town taxes, are collected by county treasurers. Until collected, there are no funds to allocate, and when collected the officers through whose hands they pass are required promptly to pass them on in the performance of their official duties. Such officers in the performance of their duties perform functions in no sense analogous to an

ordinary trust. Statutory provisions direct what shall be done.

We think we cannot do better nor make the matter clearer as to the collection and apportionment of school funds and the duties of the officers made defendants herein than by quoting from the following sections of Revised Statutes 1933, relating thereto:

"19-21-11. The treasurer must settle his account relating to the collection, care and disbursement of public revenue of whatsoever nature and kind with the auditor on the first Monday of each month. For the purpose of making such settlement he must make a statement under oath of the amount of money or other property received prior to the period of such settlement, the source whence the same was derived, the amount of payments or disbursements, with the amount remaining on hand. He must in such settlements deposit all warrants redeemed by him and take the auditor's receipt therefor. He must also make a full settlement of all accounts with the auditor annually on the second Monday of January."

"80-10-71. The treasurers of the respective counties must at any time, upon the order of the state auditor and state treasurer, settle with the state auditor and pay over to the state treasurer all moneys in their possession belonging to the state, and must, without such order, settle and pay over the moneys on the first Monday of January, April, October, November and December in each year."

"80-10-73. The county auditor of each county between the first and tenth days of each month in which the treasurer of his county is required to settle with the state auditor, must make, in triplicate, in such form as the state auditor may desire, a report showing specifically the amount due the state from each particular source of revenue at the close of business of the last day of the preceding month."

"87-4-5. The state auditor must keep a separate account of the school fund and of the interest and income thereof together with such moneys as may be raised by special tax or otherwise for school purposes; and he must, on the 31st day of March, of October and of December of each year, report to the superintendent of public instruction a statement of the securities belonging to the school fund, of the moneys in the treasury subject to apportionment, and the several sources from which they accrue. He must draw his warrant on the state treasurer in favor of the treasurer of any board of education, whenever such treasurer presents, with his indorsement, an order drawn by the superintendent of public instruction in favor of such board."

"75-8-2. * * * It shall be the duty of the state auditor to notify the state superintendent of the actual amount of money in the state treasury to the credit of the state district school fund on the 31st days of December, October and March of each year. Within ten days after receiving such notification the state superintendent shall apportion said fund among the several school districts in the state, under the provisions of this chapter, according to the number of persons between the ages of six and eighteen years residing in each district as shown by the last school-census lists, and he shall immediately furnish each treasurer of the boards of education and the superintendent of each school district with an abstract of such apportionments. He shall also certify such apportionment to the state auditor, and upon receiving such certificate the auditor shall forthwith draw his warrant on the state treasurer in favor of the treasurer of the board of education of each school district for the amount due said district. No apportionment shall be made to any school district until all the reports for the year next preceding, as required by law, have been received from such school district by the state superintendent."

Plaintiffs contend that section 7 of article 10 of the Constitution which reads, "All public School Funds shall be guaranteed by the State against loss or diversion," is applicable to the levy and collection of state school taxes. We think the constitutional provision has no application or pertinency to the issues of this cause.

The writ of mandamus is designed for the purpose of compelling action where the law enjoins the performance of the action as a duty and the person or tribunal whose duty is thus prescribed refuses to act in accordance with such law. No law has been called to our attention with which the defendants have refused or neglected to comply.

"The legal right to require the person or court [or tribunal] to proceed and the legal duty to do so must be free from doubt," otherwise the remedy by writ of mandamus must be denied. *Hoffman* v. *Lewis, Judge,* 31 Utah 179, 87 P. 167, 170. "Where the writ [of mandamus] is sought to compel action on the part of the court [officer or tribunal] the legal right to the particular action which is sought to be compelled by the writ must be clear and the legal duty to do the act or thing demanded * * * must be equally clear." *Ketchum*

*Coal Co.* v. *District Court of Carbon County,* 48 Utah 342, 159 P. 737, 740, 4 A. L. R. 619.

It is unnecessary to extend the discussion. The alternative writ of mandate heretofore issued is recalled and the permanent writ is denied. Costs to defendants.

HANSON and LARSON, JJ., concur.

FOLLAND, Chief Justice (concurring).

I concur.

I am at a loss to know how the writ of mandamus prayed for could operate at the present time against any of the defendants. It is too late to reallocate the tax revenues from any of the tax sources for the years that have passed. Plaintiffs suggest the writ should issue to command the state tax commission to levy an additional tax to make up to the school districts the amount to which they claim to be entitled. There is, however, no statutory authorization for such a levy. The writ of mandamus cannot issue in a case such as this except to compel the performance of a duty specially imposed by law. I am unable to find any breach of a duty or of a trust on the part of the defendant officials or any of them. The argument of plaintiffs proceeds on the theory of a trust violated by some one or more of the defendants because the money collected from delinquencies and redemptions was not "allocated back" to the year of levy and paid to the school districts. This argument would have merit if the tax for each year had been specifically levied for or allocated to the school boards of the several school districts of the state and made payable to them when collected, as are the taxes levied by the respective boards of education. The taxes in question, however, were levied for the purpose of augmenting the state district school fund and when collected, whether in the year of levy or subsequently, were properly payable into that fund.

So far as I can see, the various officers have discharged the trust imposed upon them. The county treasurers col-

lected the money, settled with the state auditor and paid into the state treasury the portion of such redemptions and delinquencies collected to which the state school fund was entitled. Plaintiffs argue that it was the duty of the state auditor, when the moneys collected from delinquencies and redemptions were transmitted to him, to hold them in trust for the school districts and to transmit the same to such districts as beneficiaries. The law makes no such provision. The auditor reported the amount of money in the state district school fund to the state superintendent of public instruction as required by law on the 31st day of December, October, and March of each year, whereupon the state superintendent apportioned such funds among the several school districts of the state according to the number of school children as shown by the last census. This apportionment was certified to the state auditor, who thereupon drew his warrant upon the state treasurer in favor of the treasurer of the board of education of each school district. The officers seem to have followed the statute to the letter. I think there is no necessary implication requiring them to do otherwise.

While much may be said in favor of the policy contended for by defendants, I cannot see that the Legislature has so provided, and it certainly has not specifically imposed any duty upon any of the officers with respect to the operation of such policy. In the absence of specific legislation to the contrary, the officers were justified in pursuing the same policy that had been followed by their predecessors since 1921, when the provision for $25 per year for each school child became effective.

WOLFE, Justice (concurring in the result).

While I think the permanent writ must be denied because of reasons herein stated, the prevailing opinion fails to decide the real question presented to us. It seems to me this case was brought to us in order that we might rule for the guidance of the Tax Commission in the future. It is quite true, as says the Chief Justice, that it is too late to reallocate the

tax revenues which have already been distributed. County treasurers must make detailed reports of "all moneys paid in redemption of property sold to the county and for assignments of certificates of sale thereof" on the first Monday of March of each year and at such other times as the state auditor may direct. Section 80-10-70, R. S. Utah 1933. This gives the state auditor an account of all delinquent taxes paid in and it seems to me should show the year for which they were levied. The state auditor must "notify the state superintendent [of public instruction] of the actual amount of money in the state treasury to the credit of the state district school fund on the 31st days of December, October and March of each year." Section 75-8-2, R. S. 1933. The statute does not say that the auditor must notify the state superintendent of the aggregate of all delinquent taxes paid on account of the state district school fund for the various years for which they were levied. I think it is one of the minor duties implied in order to carry out the intent of the statute. The state auditor should be able to compile this information from the detailed reports given him by the county treasurers if these latter reports carry that information. The state superintendent of public instruction, after receiving such information from the state auditor, must apportion the fund among the several school districts of the state according to the school population residing in such districts as shown by the last school census lists. It is not expressed in the statute that delinquent taxes included in the moneys in the state treasury be allocated to the school districts according to school population for the years for which the taxes were levied or that they should be credited to the district for the years they were delinquent if the districts did not receive their $25 per capita of school population, but I think that, too, is implied by the statute. I shall attempt to demonstrate this later.

I think the obligation of the county treasurers to keep separate account of the aggregate of delinquently paid taxes for each particular year in which they were levied, transmit

them to the state auditor in such form, the duty of the state auditor to inform the state treasurer of the aggregate amount of delinquent taxes for any particular year accruing to the state district school fund, the duty of the state auditor to notify the state superintendent of public instruction of, not only the total amount of money to be allotted to the school district from the state school district fund, but the aggregate of all delinquent taxes for any particular year making up that total sum, to be all implied from the statute.

The reason I think these duties to be implied arise from what I conceive to be a more major implication of the statute, to wit, that the aggregate of delinquent taxes paid for any particular year from the state school district fund must first be used to make up any shortages in the $25 per pupil in the particular years for which those taxes were collected, and that until those shortages are made up, such aggregates are not available to be included in the amount on hand for calculating, by the tax commission, the amount necessary to be collected by levy in order to make up the current $25 per pupil. I shall illustrate this more plainly when I consider the method of arriving at the levy for current state school district fund. But if I am correct in this fundamental implication arising from the fabric of statutes relating to the levying, collecting, reporting, and allocating of state school district funds, it follows that these officers must keep accounts and transmit the information regarding the aggregate of these delinquent taxes for any particular year as will permit the superintendent of public instruction to allocate those aggregates to the year for which they were collected (not the year *in* which they were collected) until the $25 per pupil for such years is made up. The accomplishment of this duty depends on the complete chain of functions from the county treasurers through the state auditor and state treasurer to the state superintendent of public instruction, each properly keeping accounts and transmitting information.

I now come to the main point of this case on which every other point depends, viz., whether the tax commission could include, in calculating the levy for this state school district fund, the delinquent taxes which were received for years previous to the year for which the levy is to be calculated or whether those taxes should go to the school districts to make up what they lacked in those years of the $25 per capita of school population. It is of that question which I shall attempt to treat.

I shall restate the problem. I start with the constitutional amendment, section 7, article 13, adopted in 1930, which as far as material to our problem reads as follows:

"The rate of taxation on tangible property shall not exceed * * * such levy for district school purposes which together with the interest on the permanent school fund * * * will raise annually an amount which equals $25.00 for each person of school age in the state as shown by the last preceding school census."

This passage measured the levy for the state school district fund. By chapter 38, Laws of Utah 1931, the Legislature amended section 5998, Comp. Laws 1917, and directed the tax commission in accordance with the then recent mandate of the people, as expressed in the said constitutional amendment, as follows:

"The tax commission is hereby authorized and directed to levy annually a State tax for district school purposes at such rate as will raise an amount, which added to any other State funds available for district school purposes, includes the money covered into the State district school fund on July first last preceding from the proceeds of the income tax Act of 1931 and the franchise tax Act of 1931 as provided in said Acts, equals as nearly as may be twenty-five dollars for each person of school age in the State as shown by the last preceding school census."

The language seems to be a mixture of a formula for annual computation and one for disposition of the revenue derived from the 1931 franchise and income taxes. But it would result in the following calculation: Determine what

was the (1) income from the permanent school fund available to the district school fund. Add to that figure (2) 75 per cent of the revenue received from taxes on income which were collected up to July 1st of the year for which the rate was to be calculated (required by reason of the constitutional amendment to section 3, article 13, passed in 1930). Add to this figure (3) 75 per cent. of the revenue from the corporation franchise tax (required by section 61, chapter 39, Laws Utah 1931). *Add to this* (4) *any other funds available for district school purposes.* The italicized phrase of this formula is the one in question hereafter. Take this total from the sum resulting from multiplying 25 by the number of persons of school age in the state as found during the preceding October. The difference is what must be made up by a levy on tangible state property. That sum is arrived at by taking the valuation of the state property obtained from the assessment returned by the counties and the tax commission and applying such a rate to it as would net the said difference. I think a tolerance factor is figured in for delinquencies and collections, but in the main, the above is the formula by which the levy for any year, including and after 1931, was to be figured. But owing to taxpayers' delinquencies in the school year of 1931-1932, there was a deficiency of $3.39 per child of school age; for the year 1932-33 a deficiency of $4.18 per child of school age; for the year 1933-34 a deficiency of $3.45 per child. From July 1, 1934, to June 30, 1935, when taxpayers were better able to pay, and in response to a campaign by the tax commission, property owners paid in $520,377.24 in delinquent taxes for previous years. And during the state fiscal year from July 1, 1935, to June 30, 1936, a total of $735,448.68. The application does not state what part of these amounts represented back taxes for particular years. The Legislature had given various extensions to delinquent taxpayers. What the tax commission did was to include the sum of $520,377.24 as an item of "other funds available for district school purposes" (item 4 in the formula) in arriving at the levy for the year of 1935

and include the sum of $735,448.68 as funds available to
district school purposes for the year 1936. This, of course,
meant a great decrease in the two levies for district school
purposes for these years. It is the contention of plaintiffs
that when a property owner pays delinquent taxes levied and
owing for any back year, that part of the tax payment which
is represented by the levy for school district purposes for
that year should be allocated to that year because it is only
a belated payment of an amount which should have been
made during the year of the levy. I cannot see why the reason-
ing is not sound. If a beneficiary is to obtain from a trust
fund income of a certain amount each year and because of de-
linquencies in the payment of income from investments
held by the trust such beneficiary fails to receive such sum,
can the trustee in after years keep back payments from the
investments to the extent they exceed the amount payable to
the beneficiary for the current year? I suppose no one would
deny that such trustee must pay such belated income to the
beneficiary to make up the amounts he was short in the
lean years. I see little difference in principle in the instant
case. The result of applying these aggregations of belated
tax payments to make up current district school funds is
to reduce the amount which the taxpayer must pay for gen-
eral state purposes. This results as follows: By chapter
63, section 21, Laws Utah 1933, as amended by chapter 20,
Laws 1933, 2d Sp. Sess., chapter 92, Laws Utah 1935, it
was provided that certain revenues derived from license
and sales taxes should be allocated first, up to $2,000,000,
to relief direct and in co-operation with the federal govern-
ment. Any sum above $2,000,000 plus expense of adminis-
tration was to make up deficiencies in the amount of taxes
collected "during the preceding or current year from the
levies for district school purposes and for district school
equalization purposes." The remainder to be allocated as
follows: The first $300,000 or so much thereof as the Gov-
ernor may find necessary, to make up deficiencies in the
general fund to meet appropriations, *"The balance to be al-*

*located to the state district school fund for the reduction
of the property tax levy for such purposes."* Any balance
of the first $2,000,000 not needed for relief also went to re-
duce the property tax levy for district school purposes.

Thus, it may be seen that if the two large sums above men-
tioned are not included in the formula for calculating the
district school levies for 1935 and 1936, much more of the
money from sales and license taxes from those years will be
required to go into this fund for those years and thus cut
down the amount which may go into the general fund, thus,
to that extent, failing to relieve the taxpayer in the levy for
general state funds; or by the same token if there is not
sufficient available from the sales tax and license revenue
fund to fill up the hole which would be left by taking out
these two big sums, the district school levy to the general
taxpayer would be increased.

I think there is much to be said for the contention of
counsel for the plaintiffs, that when the taxes are levied
in that year, that part of the total levy represented by the
levy for district school purposes immediately attaches for
the benefit of the district school fund *for that year.* When
the county treasurer collects it, he holds it as trustee for
such district school fund and that by turning it over to the
state treasurer, one trustee is substituted for another. Now
the fact that some of the tax levied for a particular year
is paid in subsequent years does not change the principle.

It is stated by the Attorney General that there is no specific
law on the subject; that is, that the law does not specifi-
cally state that these belated payments shall be allocated to
the years for which they were paid and not to the year in
which they were received. This principle that the state
school districts are entitled to have the belatedly paid taxes
credited to the years for which they were levied up to the
point where any deficiency in the $25 per capita of school
population is made up, is implied from the act. It is im-
plied in the statutes as they are read all together. The pur-
pose is plain. Perhaps the schools did get along during the

lean years after a fashion by cutting teachers' salaries and other forced economies because they had to, but I do not think that is any reason why this money that belongs to the district schools for those periods should not go to them.

Says the Attorney General, that it would be very difficult to go back over the books of each county and allocate each parcel of these huge sums to each particular year of delinquency and in support he sets out a letter from the state auditor dated August 6, 1936, showing what an insuperable task and what expense it would entail if this court handed down a decision in favor of the plaintiffs. Moreover, if the County Treasurer presents the state auditor with the information suggested herein, and the latter carries it over to the state superintendent, I see nothing insuperable about carrying out the intent of the law. I do not see why this should be permitted to cloud the issue or make wrong law. It is admitted the two large sums above mentioned represent in the aggregate the total amounts of that part of delinquent taxes paid in 1935 and 1936 belonging to the district school fund. It is admitted that the respective shortages for the three school years from 1931 to 1934 were totals amounting to the following, $3.39 multiplied by the number of children of school age taken from the census of October, 1930; $4.18 multiplied by the number of children of school age taken from the census of October, 1931; $3.45 multiplied by the number of children of school age as taken from the census of October, 1932.

They ask only that such part of these funds represented by belatedly paid taxes for these respective years be applied to make up those differences. So much of these funds which were collected for the respective school fiscal years of 1931, 1932 and 1933, together with future funds from delinquencies necessary to make up the shortage in those years, should have been and should in the future be so allocated until that shortage is made up. There has been no shortage under the $25 per pupil since the fiscal year ending June 30, 1934, so there would be nothing to make up after that time.

The Attorney General says no funds are available for allocation. This was because they have been already given to the district school fund, but as a part of their 1935 and 1936 allotment. I hardly think a wrong allocation is a sufficient defense. But the Attorney General states that for 15 years past the funds have been so allocated and no objection was raised. It seems to me this is a serious handicap to plaintiffs' recovery. Certainly, the school districts, or at least the state superintendent of public instruction for them, must or should have taken cognizance of how the levy for 1935 and 1936 was calculated. To stand by and permit the tax commission to follow an undisputed precedent and fix the levy as it did without taking action to test out the question timely, seems to me to smack strongly of laches. It is quite apparent that if we compelled the tax commission to make a reallocation and all the other defendant officers to do those things which they would have to do in consequence thereof, the march of events would finally lead to warrants on the state treasurer which he would not have funds to pay unless as suggested by plaintiffs he pay them out of the funds for general state purposes on the theory that it would be following trust funds due to the district school fund. But granted such could be done that might seriously cripple the state government until such funds could be replaced by levies. These new levies being pyramided would be a severe and unexpected burden on the taxpayer. I think we cannot issue the mandamus when there has been such laches.

For this reason, I concur in the result which orders that the alternative writ of mandamus be recalled and the permanent writ denied.